# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KENNETH NEWBY, et al., | Case No. 1:24-cv-00886-JLT-SAB |
| Petitioners, | FINDINGS AND RECOMMENDATIONS RECOMMENDING DENYING RESPONDENT TREYLED LIFE SETTLEMENTS LLC'S MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION AND IMPROPER VENUE; GRANTING RESPONDENT'S REQUEST TO TRANSFER VENUE |
| v. | |
| TREYLED LIFE SETTLEMENTS LLC, | |
| Respondent. | |
| | (ECF Nos. 9, 19, 20) |
| | **OBJECTIONS DUE WITHIN TWENTY-ONE DAYS** |

Currently before the Court is Respondent Treyled Life Settlements LLC's motion to dismiss Petitioners Kenneth Newby, Steven Campos, Jeannine Campos-Grech, and Joseph Campos' petition to vacate the arbitration award pursuant to Federal Rule of Civil Procedure 12(b)(2) and 12(b)(3), or in the alternative, to transfer venue under 28 U.S.C. § 1404(a).

The Court heard oral argument on October 9, 2024. (ECF No. 25.) Counsel Nathaniel Shapo and Michael Chiusano appeared for Petitioners, and counsel Benjamin Wagner and Kylie Calabrese appeared by video for Respondent. Based on the moving, opposition, and reply papers, the information presented by counsel at the hearing, and the Court's record, the Court recommends Respondent's motion to dismiss for lack of personal jurisdiction and improper venue be denied and that Respondent's alternative request to transfer venue be granted.

1
2

## I.

## BACKGROUND

3    Petitioners Kenneth Newby, Steven Campos, Jeannine Campos-Grech, and Joseph

4    Campos ("Petitioners"), are California residents and Trustees of the Antonio and Juliet Grace

5    Campos 2012 Insurance Trust ("the Trust").  (Pet.s' Opp'n Mot. ("Opp'n"), ECF No. 19 at 2.)[1]

6    The Trust held a $50 million life insurance policy (the "Policy"), which insured the lives of

7    Antonio Campos and his late wife Juliet Grace Campos (the "Settlors").  (Resp.'s Mot. Dismiss

8    ("Mot."), ECF No. 9 at 2.)

9    Respondent Treyled Life Settlements LLC ("Treyled") is a limited liability company

10   organized under the laws of Delaware with its principal place of business in Texas.  (Mot. 11.)

11   Treyled, a life settlement broker, facilitates the sale of existing life insurance policies by the

12   policyholder of a life settlement provider, which then sells the policy to private investment funds

13   or other institutional investors.  (Mot. 2.)  Treyled is composed of four managing partners who

14   reside in Texas: Clay Gibson, Larry Kachler, Tama Brooks Klosek, and Daniel Zeplain.  (Decl.

15   Daniel Zeplain Supp. Resp.s' Mot. Dismiss ("Zeplain Decl."), ECF No. 9-1 at ¶ 2.)

16   In 2021, Petitioners engaged their tax advisors at Deloitte to determine how to best

17   administer the Policy, which was accruing substantial annual premiums and raising tax and estate

18   planning concerns.  (Opp'n 2.)  Petitioners were considering whether to maintain the Policy or

19   surrender it for its then-cash value of approximately $7.8 million.  (Mot. 6; Zeplain Decl. ¶ 5.)

20   Deloitte suggested that Petitioners consider a life settlement and referred them to Treyled.

21   (Opp'n 8.)  A Houston-based managing director at Deloitte, Doug Robb, asked that Ms. Klosek

22   reach out to Robert Donovan, a representative of the Campos family and Chief Financial Officer

23   of Campos Brothers Farms.  (Zeplain Decl. ¶¶ 4, 5; ECF No. 19-1 at 12.)

24   On December 8, 2021, Ms. Klosek and Mr. Zeplain called Mr. Donovan to discuss

25   selling the policy and the terms that would govern such arrangement.  (Mot. 9; Zeplain Decl. ¶

26   5.)  Following weeks of intermittent discussions and negotiations via telephone and email—some

27

28   _____

[1] All references to pagination of specific documents pertain to those as indicated on the upper right corners via the CM/ECF electronic court docketing system.

1   initiated by Treyled in Texas, others by Mr. Donovan in California—the Trust and Treyled

2   signed a Broker Services Agreement (the "Agreement") on January 3, 2022. (Mot. 2.) Under

3   the agreement, Treyled agreed to provide life settlement broker services—identifying, soliciting,

4   and negotiating offers to purchase the Policy—in exchange for a commission based on the

5   proceeds of any sale. (Id.) The Agreement includes an "Exclusivity of Broker" provision under

6   which the Trust agreed it would not market or sell the policy on its own or allow anyone else to

7   do so during the Agreement's one year term, and if it did, damages would be payable to Treyled.

8   (Opp'n 9; Mot 7.)

9        After the parties signed the Agreement, Treyled began working at its own expense to

10   offer the Policy for sale, which included obtaining optimized illustrations of the Policy, ordering

11   and compiling medical records, and arranging for multiple life expectancy reports. (Zeplain

12   Decl. ¶ 9.) Treyled contacted potential buyers for the Policy located in various states, with no

13   particular connection to California. (Id.)

14        In April 2022, Treyled formally commenced the auction process, which culminated in an

15   offer from Magna Life Settlements ("Magna"), a life settlement provider based out of Texas.

16   (Id. at ¶ 10.) Meanwhile, the Trust learned that Treyled had not included Coventry First LLC

17   and its affiliate Life Equity LLC (collectively, "Coventry") in the auction. (Opp'n 11.)

18        Treyled eventually learned that the Trust had engaged in direct negotiations to sell the

19   Policy to Coventry, in violation of the Agreement's exclusivity provision. (Zeplain Decl. ¶ 11.)

20   When Coventry refused to bid for the Policy through Treyled, Mr. Donovan asked Coventry to

21   make offers directly to the Trust, which Coventry did. (Id.; Mot. 7.) Mr. Zeplain reminded Mr.

22   Donovan that the Agreement obligated that the Trust sell the Policy exclusively through Treyled,

23   and Mr. Donovan expressed that he understood. (Zeplain Decl. ¶ 11.)

24        Treyled continued to perform under the Agreement and negotiated with Magna, which

25   resulted in an ultimate gross offer of $19.5 million. (Id. at ¶ 13.) Treyled offered to reduce the

26   percent of commission it was owed pursuant to the Agreement to incentivize the Trust to accept

27   Magna's offer. (Id. at ¶ 12.) However, the Trust sold the Policy to Coventry for $18.8 million

28   and refused to pay Treyled its commission or damages. (Id. at ¶ 14.) Additionally, Coventry and

the Trust negotiated an indemnification agreement that provided the Trust full indemnity against all costs, attorney's fees, and any judgment for which the Trust was liable in any dispute with Treyled.  (Id. at ¶ 14, Ex. C.; Opp'n 11.)

On October 24, 2022, Treyled commenced an arbitration proceeding due to the Trust's failure to pay and other breaches of the Agreement.  (Zeplain Decl. ¶ 16.)  From April 2, 2024, to April 9, 2024, a final arbitration hearing was held in Houston, Texas.  (Mot. 9.)  On July 31, 2024, the Arbitrator entered a final award in Treyled's favor in the amount of $5,056,149.98, concluding that the Trust breached the Agreement, the Trust's counterclaims and defenses failed, and Treyled was entitled to full recovery, attorney's fees, costs, and interest as the prevailing party.  (Id.; Zeplain Decl. ¶ 16.)

On the same day the Arbitrator issued the final award in Texas, Petitioners filed a petition to vacate it in this Court.  (ECF No. 1.)  On August 16, 2024, Treyled filed the instant motion to dismiss.  (ECF No. 9.)  In support of its motion, Treyled provides a declaration from Daniel Zeplain.  (ECF No. 9-1.)  Following an unopposed motion to modify the briefing schedule (ECF Nos. 14, 16), Petitioners filed an opposition on September 10, 2024.  (ECF No. 19.)  On September 20, 2024, Treyled filed its reply.  (Resp.'s Reply Opp'n ("Reply"), ECF No. 20.)  A hearing was held on October 9, 2024 and the matter was taken under submission.  (ECF No. 25.)

## II.

## LEGAL STANDARDS

### A.      Motion to Dismiss Under Federal Rule of Civil Procedure 12(b)(2)

Under Rule 12(b)(2), the Court may dismiss an action for lack of personal jurisdiction. Where no federal statute authorizes personal jurisdiction, the district court applies the law of the state in which the district court sits.  Mavrix Photo, Inc. v. Brand Techs., Inc., 647 F.3d 1218, 1223 (9th Cir. 2011).  District courts in California may exercise personal jurisdiction over a nonresident defendant to the extent permitted by the Due Process Clause of the Constitution. Cal. Code Civ. P. § 410.10.  The Due Process Clause requires that the defendant have "certain minimum contacts" with the forum "such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice."  Int'l Shoe Co. v. State of Washington,

326 U.S. 310, 316 (1945) (citations and quotations omitted).

There are two bases for exercising personal jurisdiction over a nonresident defendant. First, a court may confer general jurisdiction over a nonresident defendant, which arises where the defendant's activities in the forum are sufficiently "substantial, continuous and systematic" to justify the exercise of jurisdiction over the defendant for any and all claims regardless of whether they occurred in the forum state. <u>Mavrix</u>, 647 F.3d at 1224. Courts may also assert specific jurisdiction over a nonresident defendant, which arises when a defendant's specific contacts with the forum give rise to the specific claim in dispute. <u>Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.</u>, 592 U.S. 351, 358 (2021)

"On a motion to dismiss for lack of personal jurisdiction, the plaintiff has the 'burden to establish jurisdiction.' " <u>Lee v. City of Los Angeles</u>, 250 F.3d 668, 692 (9th Cir. 2001) (quoting <u>Ziegler v. Indian River Cnty.</u>, 64 F.3d 470, 473 (9th Cir. 1995)). "When a district court acts on a defendant's motion to dismiss without first holding an evidentiary hearing, the plaintiff need only make a prima facie showing of jurisdiction to avoid the defendant's motion to dismiss. <u>Silk v. Bond</u>, 65 F.4th 445, 456 n.13 (9th Cir. 2023) (citations and quotations omitted). Conflicts between the facts contained in the parties' evidentiary submissions must be resolved in favor of the non-moving party for purposes of deciding whether a prima facie case for personal jurisdiction exists. <u>Id.</u>

**B.     Motion to Dismiss Under Federal Rule of Civil Procedure 12(b)(3)**

Under Rule 12(b)(3), the Court may dismiss an action for improper venue. "[T]he United States court in and for the district wherein the [arbitration] award was made may make an order vacating the award upon the application of any party to the arbitration…." 9 U.S.C. § 10. The Supreme Court has clarified that the venue provisions of the Federal Arbitration Act ("FAA") are permissive, permitting a motion to confirm, vacate, or modify an arbitration award either in the district where the award was made or in any district proper under the general venue statute. <u>Cortez Byrd Chips, Inc. v. Bill Harbert Const. Co.</u>, 529 U.S. 193, 195 (2000).

In pertinent part, venue in a civil action is proper in "a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part

1   of property that is the subject of the action is situated….." 28 U.S.C. § 1391(b)(2).

2   Once a defendant challenges venue, the plaintiff bears the burden of demonstrating that
3   the chosen venue is proper.  See Piedmont Label Co. v. Sun Garden Packing Co., 598 F.2d 491,
4   496 (9th Cir. 1979).  In determining whether venue is proper, the pleadings need not be accepted
5   as true, and the court may consider facts outside of the pleadings.  Doe 1 v. AOL, LLC, 552 F.3d
6   1077, 1081 (9th Cir. 2009); see also Batra v. United States Citizenship & Immigr. Servs., No.
7   2:21-CV-02489-SB-AFM, 2021 WL 4353112, at *2 (C.D. Cal. Aug. 2, 2021) (citing Murphy v.
8   Schneider Nat'l, Inc., 362 F.3d 1133, 1137 (9th Cir. 2004)).  Nonetheless, the court must draw all
9   reasonable inferences in favor of the non-moving party and resolve all factual conflicts in the
10  non-moving party's favor.  Id.

11  When venue is improper, the district court may either dismiss the action, "or if it be in the
12  interest of justice, transfer such case to any district or division in which it could have been
13  brought." 28 U.S.C. § 1406(a). "A determination of improper venue does not go to the merits of
14  the case and therefore [dismissal] must be without prejudice." In re Hall, Bayoutree Assocs.,
15  Ltd., 939 F.2d 802, 804 (9th Cir. 1991).

16          **C.      Motion to Transfer Pursuant to 28 U.S.C. § 1404**

17  "For the convenience of parties and witnesses, in the interest of justice, a district court
18  may transfer any civil action to any other district or division where it might have been brought or
19  to any district or division to which all parties have consented." 28 U.S.C. § 1404(a). "Section
20  1404(a) is intended to place discretion in the district court to adjudicate motions for transfer
21  according to an 'individualized, case-by-case consideration of convenience and fairness.' "
22  Stewart Org., Inc. v. Ricoh Corp., 487 U.S. 22, 29 (1988) (quoting Van Dusen v. Barrack, 376
23  U.S. 612, 622 (1964)).

24                                    **III.**

25                                **DISCUSSION**

26          **A.      Personal Jurisdiction**

27  As previously noted, a nonresident defendant may be subject to general or specific
28  personal jurisdiction. Goodyear Dunlop Tires Operations, S.A. v. Brown, 564 U.S. 915, 919

1  (2011).   Because Petitioners argue this Court has both general and specific jurisdiction over

2  Treyled, the Court shall address each in turn.

3      1.      General Jurisdiction

4      General jurisdiction extends to "any and all claims" brought against a defendant even if

5  those claims do not relate to the forum state or the defendant's activity there.  Ford, 592 U.S. at

6  358.  "Only a select 'set of affiliations with a forum' will expose a defendant to such sweeping

7  jurisdiction."  Id. (quoting Daimler AG v. Bauman, 571 U.S. 117, 137 (2014).)  An individual is

8  subject to general jurisdiction in her place of domicile and a corporation is subject to its place of

9  incorporation and principal place of business.  Id. (Daimler, 571 U.S. at 137.)  Outside these

10  paradigm cases, a court may also exercise general jurisdiction over a non-resident defendant

11  when its contact with the forum state is "so 'continuous and systematic' as to render [it]

12  essentially at home in the forum State."  Daimler, 571 U.S. at 137 (quoting Goodyear, 564 U.S.

13  at 919); see also Mavrix, 647 F.3d at 1223–24 ("a defendant must engage in 'continuous and

14  systematic general business contacts,'...that 'approximate physical presence' in the forum state").

15      "Because the assertion of judicial authority over a defendant is much broader in the case

16  of general jurisdiction than specific jurisdiction, a plaintiff invoking general jurisdiction must

17  meet an 'exacting standard' for the minimum contacts required."  Ranza v. Nike, 793 F.3d 1059,

18  1069 (9th Cir. 2015); see also Schwarzenegger v. Fred Martin Motor Co., 374 F.3d 797, 801 (9th

19  Cir. 2004) ("This is an exacting standard, as it should be, because a finding of general

20  jurisdiction permits a defendant to be haled into court in the forum state to answer for any of its

21  activities anywhere in the world.").  A court should only exercise general jurisdiction over a non-

22  resident defendant "in an exceptional case."  Daimler, 571 U.S. at 137 n.19.

23      To determine if a non-resident defendant's activities are sufficiently continuous and

24  systematic, courts "examine all of the defendant's activities that impact the state, including

25  whether the defendant makes sales, solicits or engages in business, serves the state's markets,

26  designates an agent for service of process, holds a license, has employees, or is incorporated

27  there."  Hirsch v. Blue Cross, Blue Shield of Kansas City, 800 F.2d 1474, 1478 (9th Cir. 1986);

28  see also Tuazon v. R.J. Reynolds Tobacco Co., 433 F.3d 1163, 1172 (9th Cir. 2006) ("Longevity,

continuity, volume, economic impact, physical presence, and integration into the state's regulatory or economic markets are among the indicia of [continuous and systematic] presence"). The Ninth Circuit has stated that it "regularly ha[s] declined to find general jurisdiction even where the contacts were quite extensive." Amoco Egypt Oil Co. v. Leonis Navigation Co., 1 F.3d 848, 851 n.3 (9th Cir. 1993).

Treyled is a limited liability company organized under the laws of Delaware, with its principal place of business in Texas, and each of its four members are domiciled in Texas. (Zeplain Decl. ¶ 3; ECF No. 22.)  Treyled owns no property in California, has no offices in California, does not have a bank account in California, and has no employees located in California. (Zeplain Decl. ¶ 3.)  Treyled's affiliate, ZKC LLC ("ZKC"), and one of its managing members, Mr. Zeplain, have been licensed life settlement brokers in California since 2015 and 2018, respectively.  (Opp'n 23.)  On August 19, 2022, Treyled received its California life settlement brokerage license.  (Id.)  Since August 2022, Treyled has marketed and advertised its services.[2]  (Zeplain Decl. ¶ 3.)

Petitioners argue that Treyled is subject to general jurisdiction because Treyled, Mr. Zeplain, and ZKC are licensed life settlement brokers in California.  (Opp'n 23.)  Although licensure alone is insufficient to meet the exacting standard to hold a non-resident to answer in the forum state, holding a license in the forum is one of many activities considered when determining whether a defendant's contacts are substantial, continuous, and systematic.  See Hirsch, 800 F.2d at 1478; Cal-Sara v. Herrig, No. 2:20-CV-10508-RGK-E, 2021 WL 7708400, at *2 (C.D. Cal. Mar. 26, 2021) (refusing to exercise general jurisdiction over a non-resident defendant that was registered with and licensed by the California Department of Insurance as both a casualty-broker agent and a property broker-agent because being licensed in a state, without more, does not establish general jurisdiction).  Here, Mr. Zeplain, ZKC, and Treyled's California life settlement brokerage licenses are activities that indicate a presence in California.

Petitioners also argue that Treyled "aggressively marketed its services" directly at the

---

[2] The Trust does not address this proffer and fails to make any showing that Treyled's post-August 2022 marketing and advertising efforts are indicia of continuous and systematic contacts in California.

1    California market and "actively solicited customers in California." (Opp'n 9, 23.) To show

2    Treyled's aggressive marketing and active solicitation of California customers, the Trust points

3    to Ms. Klosek's April 2022 presentation of a life settlements webinar certified for California

4    continuing legal education credit for the California Lawyers Association. (Opp'n 10.) In the

5    biography associated with the webinar, Ms. Klosek identified herself as a managing partner in a

6    "national life settlements originations firm, Treyled Life Settlements LLC." (Id.)

7          Petitioners also rely on a 2022 article co-authored by Ms. Klosek about life settlements

8    that was published in California Trusts and Estates Quarterly. (Id.) Designated by an asterisk on

9    the last page of the article, Ms. Klosek is identified as being associated with "Klosek &

10    Associates PLLC; Treyled Life Settlements LLC, Houston, Texas." (ECF No. 19-1 at 69, 74.)

11    Petitioners emphasize that Ms. Klosek described the article as "a really great opportunity" at the

12    arbitration hearing and testified that she hoped readers of the article "might consider [Treyled] to

13    be a resource." (Opp'n 9 (quoting ECF No. 19-1 at 26, 29).)

14          Treyled argues that neither Ms. Klosek's article nor the webinar constitute marketing

15    activities by Treyled. (Reply 10.) Instead, Treyled argues both were activities performed in Ms.

16    Klosek's personal capacity. Treyled notes that Ms. Klosek recorded the webinar from Houston

17    and the recording can be viewed by anyone in any location. (Reply 7.) Treyled also points to

18    Ms. Klosek's testimony at the arbitration hearing where she confirmed that she authored the

19    article "individually as a lawyer" and that the article "wasn't a Treyled Life Settlements piece."

20    (Reply 7; ECF No. 19-1 at 39, 40.)

21          Even accepting Petitioners' contention that Ms. Klosek's article and webinar can be

22    imputed to Treyled as marketing and solicitation, "[m]arketing to forum residents, at least where

23    such marketing does not result in substantial and continuous commerce with the forum, does not

24    support general jurisdiction." CollegeSource, Inc. v. AcademyOne, Inc., 653 F.3d 1066, 1075

25    (9th Cir. 2011). Petitioners do not make any showing that Ms. Klosek's article and webinar, or

26    any other marketing by Treyled, resulted in any business for Treyled with California. One article

27    and one webinar directed to the California legal market fall far below the marketing and

28    solicitation efforts found to be sufficient in the Ninth Circuit to confer general jurisdiction. See,

1    e.g., Tuazon, 433 F.3d at 1167 (conferring general jurisdiction over a non-resident defendant

2    where, in part, its contacts with the forum state included over fifty years of advertising in purely

3    local publications); Congoleum Corp. v. DLW Aktiengesellschaft, 729 F.2d 1240, 1242–43 (9th

4    Cir. 1984) (finding that a non-resident corporation's sales and marketing efforts in the forum

5    state, including solicitation of orders, promotion of products to potential customers through mail

6    and showroom displays, and attendance at trade shows and sales meetings were insufficient to

7    assert general jurisdiction); Gates Learjet Corp. v. Jensen, 743 F.2d 1325, 1330-31 (9th Cir.

8    1984) (refusing to confer general jurisdiction over defendants despite several visits and

9    purchases in forum, solicitation of contract in forum which included a choice of law provision

10    favoring forum, and extensive communication with forum); Shute v. Carnival Cruise Lines, 897

11    F.2d 377, 381 (9th Cir. 1990) (finding no general jurisdiction despite the non-resident defendant

12    advertising in the local media, mailing brochures and payment of commissions into the forum,

13    conducting promotional seminars, and making sales to forum residents) rev'd on other grounds,

14    499 U.S. 585 (1991).

15       The Court also recognizes Treyled entered one contractual relationship with the

16    California-sitused Trust. However, "determining whether a corporate defendant's contacts in a

17    particular case are substantial and continuous turns on the 'economic reality of the defendants'

18    activities….' " Tuazon, 433 F.3d at 1173 (citation omitted); see also Stage Nine Design, LLC v.

19    Rock-It Cargo USA, LLC, No. 2:21-CV-00722-WBS-AC, 2021 WL 3565310, at *3 (E.D. Cal.

20    Aug. 12, 2021) (noting that the court's general jurisdiction analysis must "involve a comparative

21    assessment of the defendant's business activities in different locations") (citing Lindora, LLC v.

22    Isagenix Int'l, LLC, 198 F. Supp. 3d 1127, 1137 (S.D. Cal. 2016) (finding no general jurisdiction

23    where the plaintiff failed to make a comparative assessment and instead solely focused on the

24    defendant's extensive contacts in California)).  Here, Petitioners fail to offer the economic reality

25    or any comparative assessment of Treyled's business activities.  For example, Petitioners do not

26    offer any evidence showing whether Treyled has brokered any policies by California residents

27    prior to or after the Trust's; how much of Treyled's overall business is conducted in California;

28    what percentage of Treyled's revenue consists of commission from selling California policies; or

1    the nature and quantity of Treyled's marketing and advertisements in California.

2            Treyled's limited contacts proffered by Petitioners fall far short of the continuous and

3    systematic contacts that the Ninth Circuit requires to confer general jurisdiction over a non-

4    resident defendant. See, e.g., Tuazon, 433 F.3d 1163 at 1167 (conferring general jurisdiction in

5    Washington where the non-resident defendant had been licensed to do business in Washington

6    for over sixty years, maintained an office in Washington, sold 2.5 to 3 million products in

7    Washington annually which generated $145-240 million in net sales each year, held a 29-31%

8    market share in Washington, engaged in local political activity to protect its market, and targeted

9    Washington consumers through advertisements in local Washington publications for over fifty

10   years).  Petitioners have failed to meet their high burden to show that Treyled's presence in

11   California amounts to an exceptional case.  Daimler, 571 U.S. at 137 n.19.  The Court finds the

12   California life settlement broker's licenses of Treyled, Mr. Zeplain, and ZKC; one article

13   coauthored by one of Treyled's managing members in a California law journal; one webinar

14   conducted by one of Treyled's managing members for a California legal association; and one

15   contract entered into with a California-sitused Trust do not establish substantial or continuous

16   and systematic contacts such that Treyled is at home or has an approximate physical presence in

17   California that allows Treyled to be haled into a California court to answer for any of its

18   activities anywhere in the world.  Id. at 139-40; Tuazon, 433 F.3d at 1169; Schwarzenegger, 374

19   F.3d at 801.  Accordingly, the Court recommends finding Treyled's contacts with California are

20   insufficient to subject it to general jurisdiction in California.

21           2.    Specific Jurisdiction

22           Petitioners also argue that the Court has specific jurisdiction over Treyled.  "Specific

23   jurisdiction is different [than general jurisdiction]: It covers defendants less intimately connected

24   with a State, but only as to a narrower class of claims."  Ford, 592 U.S. at 359.  To determine

25   whether specific jurisdiction exists over a nonresident defendant, the Ninth Circuit applies "a

26   three-part test, derived from the Due Process Clause, that examines the defendant's purposeful

27   conduct towards the forum, the relation between his conduct and the cause of action asserted

28   against him, and the reasonableness of the exercise of jurisdiction."  Silk, 65 F.4th at 456-57.

1    Petitioners bear the burden of satisfying the first two prongs.  See Boschetto v. Hansing, 539

2    F.3d 1011, 1016 (9th Cir. 2008).  If Petitioners "establish[] both prongs one and two, [Treyled]

3    must come forward with a compelling case that the exercise of jurisdiction would not be

4    reasonable." Id. (quotation omitted).

5              **a.      Purposeful Availment**

6              A court may exercise specific personal jurisdiction over a nonresident defendant if "the

7    nonresident defendant purposefully directs his activities at the forum or performs some act by

8    which he purposefully avails himself of the privilege of conducting activities in the forum,

9    thereby invoking the benefits and protections of its laws." Schwarzenegger, 374 F.3d at 802.

10   Purposeful availment and purposeful direction are two distinct concepts.  Id.  "A purposeful

11   availment analysis is most often used in suits sounding in contract.  A purposeful direction

12   analysis, on the other hand, is most often used in suits sounding in tort." Id. (citations omitted).

13             The parties have characterized the first prong of the specific jurisdiction test as a question

14   of purposeful availment.  (See Mot. 11; Opp'n 19.)  Accordingly, the Court addresses the first

15   prong under the contractual purposeful availment approach.  To show purposeful availment,

16   Petitioners must demonstrate that Treyled "engage[d] in some form of affirmative conduct

17   allowing or promoting the transaction of business within the forum state.  This focus on the

18   defendant's affirmative conduct is designed to ensure that the defendant is not haled into court as

19   the result of random, fortuitous, or attenuated contacts." Gray & Co. v. Firstenber Mach. Co.,

20   913 F.2d 758, 760 (9th Cir. 1990) (citation and quotation omitted).  "A showing that a defendant

21   purposefully availed himself of the privilege of doing business in a forum state typically consists

22   of evidence of the defendant's actions in the forum, such as executing or performing a contract

23   there." Schwarzenegger, 374 F.3d at 802.  However, a contract with an out-of-state party does

24   not automatically establish the requisite minimum contacts necessary for the exercise of personal

25   jurisdiction. Burger King Corp. v. Rudzewicz, 471 U.S. 462, 478 (1985); see also Roth v. Garcia

26   Marquez, 942 F.2d 617, 621 (9th Cir. 1991) ("the existence of a contract with a resident of the

27   forum state is insufficient by itself to create personal jurisdiction over the nonresident.").  Rather,

28   when a contract is offered as the basis of personal jurisdiction, the court must "use a highly

1   realistic approach that recognizes that a contract is ordinarily but an intermediate step serving to
2   tie up prior business negotiations with future consequences which themselves are the real object
3   of the business transaction." Burger King, 471 U.S. at 479.

4          Treyled's Agreement with the Trust to facilitate the sale of the Policy alone is insufficient
5   to show that Treyled purposefully availed itself of the privilege of conducting business in
6   California.   Rather, courts must evaluate "prior negotiations and contemplated future
7   consequences, along with the terms of the contract and the parties' actual course of dealing" to
8   determine if the defendant's contacts are "substantial" and not merely "random, fortuitous, or
9   attenuated." Sher v. Johnson, 911 F.2d 1357, 1362 (9th Cir. 1990) (quoting Burger King, 471
10  U.S. at 478 (internal quotations omitted)); Davis v. Cranfield Aerospace Sols., Ltd., 71 F.4th
11  1154, 1163 (9th Cir. 2023), cert. denied, 144 S. Ct. 826, (2024) ("Purposeful availment can be
12  established by a contract's negotiations, its terms, its contemplated future consequences, and the
13  parties' actual course of dealing.")

14         Treyled argues its main contact with California was entering the Agreement with the
15  California-sitused Trust.  Treyled otherwise avers it was solicited by the Trust and negotiations
16  occurred remotely; none of the Agreement's terms invoke the laws of California; the Agreement
17  does not contemplate anything occurring in California; and the full extent of Treyled's course of
18  dealing that touched California was limited to telephone calls and e-mails with the Mr. Donovan.
19  (Mot. 11-13.)  The Trust, however, argues Treyled purposefully availed itself of the privilege of
20  conducting activities in California by promoting the transaction of life settlements in California
21  through Ms. Klosek's article and webinar; soliciting the California representatives of the Trust;
22  initiating negotiations over the Agreement with the California representatives of the Trust; and
23  engaging in life settlement brokerage services on behalf of California residents. (Opp'n 14.)[3] The

24

---

25  [3] At the hearing, Petitioners argued for the first time that the Agreement and California Insurance Code created an
26  agent-fiduciary relationship between Treyled and the Trust, whereby Treyled acted as an extension of a California
    resident for purposes of selling the Policy. Petitioners averred that agency principles alone are sufficient to establish
    that Treyled purposefully availed itself of the privilege of doing business in California. Petitioners did not offer any
27  analogous supporting authority. Petitioners argued at the hearing that this argument was adequately addressed in its
    briefing because the word "fiduciary" is cited in its opposition eleven times; however, the Court notes the term is
28  cited exactly zero times in Petitioners' purposeful availment argument. Because the Court recommends finding
    purposeful availment is satisfied on other grounds, the Court does not address Treyled's new and unsupported

1   Court shall address each argument in turn.

2   Petitioners first argue that Ms. Klosek's directed marketing through her webinar and

3   article—which she purportedly emailed to "the Trust's representative" before Treyled began

4   auctioning the Policy—that identify her as Treyled's managing partner is the essence of

5   Treyled's promotion of the transaction of life settlements in California. (Opp'n 14-15.) See Sher,

6   911 F.2d at 1362 ("Purposeful availment requires that the defendant have performed some type

7   of affirmative conduct which allows or promotes the transaction of business within the forum

8   state.") (quoting Sinatra v. Nat'l Enquirer, Inc., 854 F.2d 1191, 1195 (9th Cir. 1988)).   In

9   response, Treyled vehemently disputes the article was ever emailed to "the Trust's

10  representative"; rather, it was emailed to Mr. Robb, the Deloitte agent in Texas, who is not

11  affiliated with the Trust.  (Reply 2.)  Treyled argues that there is no evidence showing that Mr.

12  Donovan or any other representative of the Trust saw the article prior to entering the Agreement.

13  To the contrary, Ms. Klosek testified at the arbitration hearing that "the Camposes never had this

14  article. This article was actually published in a journal that's for lawyers. It was published

15  subsequent to engaging our firm. And it was provided to Deloitte subsequent to Deloitte even

16  recommending that our firm be engaged….regardless of what this article says, the Trust and Mr.

17  Donovan knew at all times that that was not our plan for marketing this policy."  (ECF No. 19-1

18  at 36.)  Other than Petitioners' passing contention, the Court finds no evidence in the record that

19  disputes Treyled's showing that Ms. Klosek did not market Treyled to the Trust by sending the

20  article or any other marketing material to any Trust representative or associate.

21  The issue remains, however, whether Ms. Klosek's article and webinar constitute

22  affirmative conduct that promotes Treyled's transaction of business in California.  (See Opp'n 15

23  (citing Portrait Displays, Inc. v. Speece, No. C-04-1501 RMW, 2004 WL 1964506, (N.D. Cal.

24  Sept. 3, 2004) (finding the defendants engaged in affirmative conduct sufficient to show

25  purposeful availment through defendant's attendance at a trade show in the forum to market the

26  plaintiff's infringed product and the defendant's sale and marketing activity of the infringed

27  _____

28  argument regarding whether a statutory agent-fiduciary natured relationship independently supports purposeful availment.

product on its interactive website)).)  The Trust points to testimony from Ms. Klosek where she agreed at the arbitration hearing that one possible benefit of the article was more people "engag[ing] in life settlement transactions perhaps through Treyled, perhaps through others." (Opp'n 9 (quoting ECF No. 19-1 at 27)).  See Asahi Metal Indus. Co. v. Superior Court of California, Solano Cty., 480 U.S. 102, 112 (1987) (noting examples of conduct that may satisfy purposeful availment include "advertising in the forum state, establishing channels for providing regular advice to customers in the forum State, or marketing the product through a distributor who has agreed to serve as the sales agent in the forum State.").  However, Ms. Klosek's webinar and co-authored article only mention her association with Treyled.  The substance of the webinar and co-authored article, which describe the life settlements process and generally advise policyholders to contact a qualified life settlement broker, do not directly promote the transaction of life settlements in California by Treyled.  The Court does not find Ms. Klosek's webinar and article constitute advertising or otherwise affirmative conduct by Treyled in California.[4]

Petitioners also argue in their briefing that Treyled purposefully availed itself of California by soliciting the representatives of the Trust.  (Opp'n 14-16 (citing Roth, 942 F.2d at 621-22 (noting the question of purposeful availment depends, in part, which party initiated contact); Senne v. Kansas City Royals Baseball Corp., 105 F. Supp. 3d 981, 1023 (N.D. Cal. 2015) (noting that "courts do not focus narrowly on the negotiation of specific contract terms; rather, they consider which party initiated the negotiations and whether the defendant reached out to the plaintiff in the forum (a factor that may support a finding of contractual purposeful availment).").))  However, Petitioners abandoned the argument at the October 9, 2024 hearing, and for good reason.  It is undisputed that Treyled was contacted by Mr. Robb, a Texas-based agent of the Trust's advisor, Deloitte, who informed Treyled that the Trust was interested in selling the Policy and using Treyled to do it.  (Zeplain Decl. ¶ 5; ECF No. 19-1 at 12 (Ms. Klosek arguing at the arbitration hearing that "[Mr. Robb] said, [Mr. Donovan] would like you to

---

[4] As discussed in more detail below, even if the District Judge finds Ms. Klosek's article and/or webinar constitute affirmative conduct by Treyled that promotes the transaction of business in California, this Court recommends finding Petitioners' claims do not arise out of either the webinar or article under the second prong of the specific jurisdiction analysis.

1   call him.  And [Mr. Robb] sent me the contact information for Bob Donovan and arranged for

2   the initial call with me and Daniel [Zeplain].").)  The Trust offers no evidence that Treyled

3   reached into California for the Trust's business until after the Trust's representative in California

4   asked the Texas Deloitte agent to contact Treyled.  Because the Trust initiated contact with

5   Treyled through Deloitte, this factor does not support a finding of purposeful availment by

6   Treyled.

7           Petitioners also argue that Treyled purposefully availed itself by engaging in negotiations

8   over the terms of the Agreement with the Trust's representative.  (Opp'n 9.)  After the Trust

9   reached into Texas and solicited Treyled through Deloitte, Treyled contacted the Trust's

10  representative in California via telephone.  (Id.)  Following a December 9, 2021 conversation

11  between Ms. Klosek, Mr. Zeplain, and Mr. Donovan, Treyled and the Trust exchanged fewer

12  than twenty emails and fewer than five telephone calls before entering into the Agreement on

13  January 3, 2022.  (Zeplain Decl. ¶ 6; Opp'n 9.)  Petitioners point out that Treyled emailed its

14  form Agreement from Texas to California for the Trust's execution in California.  (Opp'n 15

15  (citing ECF No. 19-1 at 60).)  Petitioners also note that Ms. Klosek confirmed at the arbitration

16  hearing that it was a "regular part of [her] practice to communicate with Mr. Donovan, who was

17  in California, over e-mail[.]" (ECF No. 19-1 at 20-21.)  Treyled, however, maintains that the

18  contract negotiations were limited to telephone and email and no one from Treyled ever visited

19  the Trust in California.  (Reply 8.)

20          "[B]oth [the Ninth Circuit] and the courts of California have concluded that ordinarily

21  'use of the mails, telephone, or other international communications simply do not qualify as

22  purposeful activity invoking the benefits and protection of the [forum] state." Peterson v.

23  Kennedy, 771 F.2d 1244, 1272 (9th Cir. 1985) (citing Thos. P. Gonzalez Corp. v. Consejo

24  Nacional de Produccion de Costa Rica, 614 F.2d 1247, 1252, 1254 (9th Cir. 1980) (finding the

25  parties' use of mail to negotiate a contract was insufficient to establish the purposeful availment

26  prong for personal jurisdiction in California); see also Roth, 942 F.2d at 621-22 (quoting Thos.

27  P. Gonzalez, 614 F.2d at 1252 ("When a California business seeks out purchasers in other states

28  ... [and] deals with them by out-of-state agents or by interstate mail and telephone, it is not

1 | entitled to force the customer to come to California to defend an action on the contract.").)  The

2 | Court finds that Treyled's use of telephone and email to negotiate the contract with the Trust

3 | after the Trust sought out Treyled's business from California does not support subjecting Treyled

4 | to personal jurisdiction in California.  Thus, the manner of contract negotiations does not support

5 | a finding of purposeful availment.

6 |      Neither does the substance of the proffered negotiations support a finding of purposeful

7 | availment.  Petitioners contend that Treyled purposefully availed itself of California by engaging

8 | in substantial negotiations over certain terms of Treyled's form Agreement, including provisions

9 | on fees, commissions, and exclusivity.  (Opp'n 15-16.)  However, Petitioners fail to show how

10 | Treyled's ultimate modification of its form Agreement to not charge a commission on the cash

11 | value already built up in the Policy, Treyled's capping of its commission, or how Treyled's

12 | discussion of the standard exclusivity provision with Mr. Donovan reflect any intent by Treyled

13 | to avail itself of California's protections and benefits.  (ECF No. 19-1 at 85-86.)  The Court finds

14 | the parties' remotely conducted contract negotiations, initiated only by the Trust's reach into

15 | Texas through Deloitte, do not establish purposeful availment by Treyled.

16 |      Petitioners further argue that Treyled purposefully availed itself by engaging in life

17 | settlement brokerage services on behalf of California residents.  (Opp'n 16.)  The Court looks to

18 | the Agreement's terms, its contemplated consequences, and the parties' actual course of dealing

19 | to determine whether Treyled purposefully availed itself of the privilege of conducting activities

20 | in California when it engaged in life settlement brokerage services on behalf of Petitioners.

21 | Burger King, 471 U.S. at 479.

22 |      Treyled argues that none of the Agreement's terms invoke the laws of California.  (Mot.

23 | 12.)  Treyled points to the Agreement's governing law provision, which expressly states that

24 | "[t]his Agreement is intended to be performed in the State of Texas and shall be interpreted,

25 | construed, governed and enforced according to the laws of the State of Texas, without reference

26 | to its conflicts or choice of laws principles."  (ECF No. 9-1 at 30.)  The Ninth Circuit has

27 | previously noted that while a choice of law provision "should not be ignored in determining

28 | purposeful availment, it will not suffice to block jurisdiction in California where other facts

1  indicate that the [defendant] has purposely directed its activities towards [California residents]."

2  Haisten v. Grass Valley Med. Reimbursement Fund, Ltd., 784 F.2d 1392, 1399–1400 (9th Cir.

3  1986) (citing Burger King, 471 U.S. at 481-82); see also Hanson v. Denckla, 357 U.S. 235, 254

4  (1958) ("The issue is personal jurisdiction, not choice of law.  It is resolved in this case by

5  considering the acts of the [defendant].").  Although the Court does not ignore the fact that the

6  parties entered an executory contract agreeing that the Agreement was to be enforced by Texas

7  law and was intended to be performed in Texas, such a provision on its own does not bar the

8  Court from exercising jurisdiction over Treyled where facts otherwise indicate Treyled

9  purposefully availed itself of the privilege of conducting activities in California.

10      Treyled also points to the forum selection clause in the Agreement, which selects Texas

11  as the venue for arbitration in the event of a dispute.  (Mot. 12 (citing ECF No. 9-1 at 29).)

12  Generally, a forum selection clause could amount to a waiver of personal jurisdiction and act as

13  consent to the contracted forum's jurisdiction.  Burger King Corp., 471 U.S. at 473 n.14.  This

14  action sits in a unique procedural posture.  The parties have engaged in nearly two years of

15  arbitration and a final hearing was held in Texas before a Texas arbitrator.  (Reply 10; Zeplain

16  Decl. ¶ 18.)  The forum selection clause selecting Texas as the venue for arbitration was fulfilled

17  without issue.  As Petitioners point out, however, the Agreement does not specify that a petition

18  to confirm or vacate any arbitration award be heard in a specific court, let alone a district court in

19  Texas.  See 9 U.S.C. §§ 9, 10; Cortez Byrd Chips, 529 U.S. at 195 (recognizing that a petition to

20  vacate an arbitration award under 9 U.S.C. § 10 begins a separate proceeding and that the venue

21  provisions in sections 9-11 of the FAA are permissive, and thus not limited to the district court

22  where the arbitration occurred); see also Aero Air, L.L.C. v. Sino Swearingen Aircraft Corp., No.

23  CV-07-283-ST, 2007 WL 9809067, at *3 (D. Or. Mar. 13, 2007) (recognizing that a motion to

24  vacate is a new, separate cause of action and separate proceeding).  The clause selecting Texas as

25  the *venue* for arbitration does not assist the Court in its determination of whether Treyled is

26  subject to *personal jurisdiction* in California in a separate proceeding to vacate the arbitration

27  award.

28      Treyled also briefly argues that it assumes the appropriate focus for the minimum

1    contacts analysis is Treyled's contacts related to the dispute underlying the arbitration award.

2    (Mot. 13 n.6.)  Treyled proffers, however, that some district courts have recently evaluated the

3    minimum contacts analysis on contacts relating to the arbitration itself, not the contacts related to

4    the underlying dispute.  (Id.)  Notably, the recent shift appears to rest on interpretation of the

5    Supreme Court's decision in Badgerow v. Walters, 596 U.S. 1 (2022).  There, the Court held that

6    a federal court, in determining whether it has jurisdiction to decide a petition to confirm, vacate,

7    or modify an arbitral award depends only on "the application actually submitted to [the court],"

8    and does not "look through" the petition to the underlying dispute between the parties.  Id. at 5.

9    Badgerow focused on subject matter jurisdiction without ever addressing personal jurisdiction.

10   A few district courts have carried over Badgerow's bar on looking through the petition to the

11   underlying dispute to determine subject matter jurisdiction to also include a bar on looking

12   through the petition to assess personal jurisdiction.

13          The Ninth Circuit has not revisited the vacatur of an arbitral award post-Badgerow in the

14   context of determining personal jurisdiction.  However, pre-Badgerow, the circuit has affirmed a

15   district court's finding of personal jurisdiction over a non-resident defendant by looking though

16   the arbitral award and considering the contacts between the non-resident defendant and the

17   forum state to confirm an arbitral award.  Greenfield Advisors LLC v. Salas, 733 F. App'x 364,

18   (9th Cir. 2018).[5]  The Court notes, however, that the confirmed award in Greenfield was a

19   foreign arbitral award, which is governed by Chapter Two of the FAA.  Badgerow, however,

20   involved interpreting the FAA provisions governing a domestic arbitration, like that in the instant

21   dispute.  596 U.S. at 10-11.

22          This Court recommends declining to interpret Badgerow to limit a court's personal

23   jurisdiction analysis to contacts related only to the petition without looking through the petition

24   to conduct an analysis of the respondent's contacts related to the underlying dispute.  Where

25   subject matter jurisdiction requires an independent basis to exercise jurisdiction over FAA cases,

26   personal jurisdiction is determinative upon the extent of a state's long-arm statute and is rooted

27

28   [5] Citation to this unpublished Ninth Circuit opinion is appropriate pursuant to Ninth Circuit Rule 36-3(b).

1   in due process.  See Conti 11. Container Schiffarts-GMBH & Co. KG M.S., MSC Flaminia v.

2   MSC Mediterranean Shipping Co. S.A., 91 F.4th 789, 797 (5th Cir. 2024)  (explaining that

3   Badgerow answered a question "that required examining whether Congress had granted subject

4   matter jurisdiction over FAA proceedings. The question here, by contrast, is whether exercising

5   personal jurisdiction…is 'reasonable, in the context of our federal system of government,' and

6   'does not offend traditional notions of fair play and substantial justice.' ").  Treyled conceded at

7   the hearing that current Ninth Circuit authority allows a court to look through the arbitral award

8   to analyze contacts related to the underlying dispute to determine personal jurisdiction.  Thus, the

9   Court proceeds in analyzing Treyled's contacts with California under the Agreement.

10          Looking through the petition to Treyled's contacts with California related to the

11   underlying dispute, the Agreement provides that:

> Broker shall comply with all applicable federal, state and local
> laws, statutes, ordinances, decisions, rules, regulations and orders
> governing licensing and the solicitation, brokering, sale and
> settlement of life insurance policies and all applicable privacy laws
> and regulations…In particular, Broker shall, at its own expense,
> obtain and maintain in good standing all licenses, permits, or other
> governmental approvals required of it in order for it to perform its
> covenants, duties, obligations and services under this Agreement.
> *Broker hereby acknowledges that its maintenance of applicable
> licenses is required as a condition for receipt of a Broker
> Commission from Policyholder pursuant to this Agreement.*

18   (ECF No. 9-1 at 30 (emphasis added).)  At the arbitration hearing, Treyled agreed appropriate

19   licenses included a California life settlement broker license pursuant to the California Insurance

20   Code.  (ECF No. 19-1 at 11; see also id. at 51 (Mr. Zeplain testifying at the arbitration "We've

21   always had the appropriate licenses, whatever those may be, whether it be in California or some

22   other state"); id. at 55-56 (arguing at the arbitration hearing that "Treyled…through its principal,

23   Mr. Zeplain, has always had the proper life settlement brokerage in California and in Texas.

24   That's exactly the service we provided. We were always a life settlement broker with all of the

25   fiduciary duties that flow from that.")).) [6]

26

27   [6] In the Agreement, Broker is defined as "Treyled Life Settlements LLC, a Delaware limited liability company,
     which works through its duly licensed, where required, viatical/life settlement broker affiliates and/or principals."

28   (ECF No. 9-1 at 28.) The Court herein only references Treyled as the Broker. Uniquely, Treyled—the party
     disputing personal jurisdiction—maintains it was properly licensed in California during the auction process through

20

1    Petitioners argue that the "economic realit[y]" of the Agreement was that Treyled would
2    comply with California life settlement broker licensing laws in exchange for the receipt of any
3    commission owed as a result of a sale of the Policy.  (ECF No. 27 at 37:8-18.)  Petitioners aver
4    that a future consequence of the Agreement was that Treyled would directly benefit from the
5    privileges and protections of the state of California.

6    Petitioners cite <u>Roth v. Garcia Marquez</u>, 942 F.2d 617 (9th Cir. 1991) in support.  There,
7    a California movie producer initiated a lawsuit against defendants, a non-resident author and his
8    agent, in California for rights to produce a film based upon the defendant's book.  <u>Id.</u> at 619.
9    The court found two facts marginally worked in the non-resident defendants' favor: "their
10   minimum physical presence in the forum and the fact that it was the [California plaintiff] who
11   made the sedulous efforts of solicitation" of the defendants.  <u>Id.</u> at 622.  However, in a "very
12   close call" where "neither side decisively triumphs," the Ninth Circuit found that the future
13   consequences of the contract constituted "enough purposeful availment…to compel a finding of
14   jurisdiction."  <u>Id.</u>  Significantly, most of the future of the contract would have been performed in
15   and centered on and depended upon activities in California.  <u>Id.</u>  The court looked at the
16   "economic reality," and determined that the contract's subject would have continuing and
17   extensive involvement with California.  <u>Id.</u>

18   Petitioners also note <u>Graham-Bingham Irrevocable Trust v. Trudeau</u>, No. C12-755RAJ,
19   2012 WL 13020031 (W.D. Wash. Oct. 23, 2012). There, a life insurance policy governed by
20   Washington law insured a Washington resident.  <u>Id.</u> at *1.  The Washington trustees of the policy
21   enlisted a third party to sell the policy. The defendant, a Connecticut resident who was an
22   insurance broker that held a brokerage license in Washington, negotiated the purchase of the
23   policy with the third party without engaging in any discussions with the Washington plaintiffs.

24   the licenses of Mr. Zeplain and ZKC. It is Petitioners—who raise the argument that holding a license in California is
25   a "determinative factor" of Treyled's purposeful availment—that contend that Treyled was not properly licensed
     when it signed the Agreement and conducted an auction. (Opp'n 17.) Because only the Rule 12 motions have been
26   referred to the undersigned, this Court is in the awkward position of avoiding a merits-based determination of
     whether Treyled was properly licensed in California at all relevant times. The Court offers no recommendation
27   regarding whether Treyled properly worked through Mr. Zeplain and/or ZKC's California life settlement broker
     licenses. Rather, the Court only relies on the contemplated consequences of the Agreement that relate to licensure.
28   No finding or recommendation of this Court that incidentally touches the merits of the pending petition to vacate the
     arbitration award binds the District Judge in any way.

21

1   During the negotiations, the defendant learned the policyholders did not have enough money to

2   make a payment on the policy.  To prevent the policy from lapsing, the defendant agreed to make

3   the payment in exchange for securing a right to buy or sell the policy at a later time.  The

4   plaintiffs signed a promissory note to the defendant, which also contained Washington choice of

5   law and forum selection clauses.  Id. at *2.  Despite knowing his account did not have sufficient

6   funds, the defendant drew a check from a Connecticut bank account and deposited it into the

7   policy's account.  When the insurer discovered the payment was invalid, it declared that the

8   policy had lapsed. The Washington plaintiffs sued the Connecticut defendant in Washington. The

9   court found, in a "close call," that the defendant purposely availed himself of the privilege of

10  doing business in Washington when he made the deposit which commenced an ongoing

11  relationship that focused in part on activity that would take place in Washington in the future. Id.

12  at *3.

13         Similar to Roth and Graham, this case is a "very close call."  Roth, 942 F.2d at 622;

14  Graham, 2012 WL 13020031 at *4.  Although Petitioners first solicited Treyled and no Treyled

15  agent ever physically entered California, the Court recommends finding that the Agreement's

16  terms and contemplated future consequences minimally support Treyled's purposeful availment

17  of the privilege of conducting activities in California.  Specifically, the Agreement's terms,

18  which were contemplated and bargained for by Treyled, invoke the laws of California through

19  the licensure provision.  The Court recognizes that the Agreement is a form agreement that does

20  not expressly reference California law; rather, it generically states that "maintenance of

21  applicable licenses is required as a condition for receipt" of Treyled's commission.  (ECF No. 9-

22  1 at 30.)  However, the effect of the form agreement, as Treyled acknowledged in the arbitration

23  hearing, was a California life settlement broker license governed by California law.  (ECF No.

24  19-1 at 51, 55-56.)  Treyled's receipt and maintenance of a California life settlement broker

25  license was a condition precedent for receipt of Treyled's commission from the ultimate sale of

26  the Policy.  (ECF No. 9-1 at 29.)  In other words, by agreeing it would obtain and maintain a

27  California life settlement brokerage license, Treyled was looking to the benefit and protections of

28  California law to receive its commission.  Treyled thus contemplated future consequences and

1  continuing involvement in California, including that receipt of its commission would require

2  obtaining a license from the California Department of Insurance and maintaining that license in

3  compliance with California law.  See Sher, 911 F.2d at 1363 (finding a non-resident law firm

4  "contemplated [significant] future consequences" in California where it executed a deed of trust

5  to encumber the client's California real estate as security interest for legal representation,

6  including that "perfection of the [firm's] security interest would require filing in the California

7  recorder's office; judgment on the deed would require the application of California law;

8  enforcement of such a judgment would require the action of a California court.").  To be clear,

9  this Court does not recommend finding a non-resident defendant is subject to specific

10 jurisdiction solely because it holds a California life settlement broker license.[7]  Rather, the Court

11 finds Treyled contemplated and deliberately bargained to perform affirmative conduct in

12 California, which included obtaining and maintaining a California license in compliance with

13 California law, as a condition precedent to receiving its benefit of entering the Agreement.

14      Additionally, when Treyled and the Trust entered the Agreement, Treyled created a

15 continuing relationship with the Trust that required ongoing obligations to the Trust in

16 California.  Notably, the Agreement deliberately created continuing obligations that Treyled

17 would reach into California to keep the Trust reasonably informed regarding any offers to

18 purchase the Policy.  (ECF No. 9-1 at 28; Opp'n 17 n.6.)  Indeed, the actual course of dealing

19 reveals Treyled fulfilled this obligation at least once when it received the Magna offer, then

20 reached into California to communicate the offer to the Trust.  (ECF No. 9-1 at 14, see Mot 5

21 n.1; Zeplain Decl. ¶ 10.)  Treyled then attempted to re-negotiate with the Trust's representative

22 in California, which included offers to reduce the percent of commission owed to it, to

23 incentivize the Trust to accept Magna's offer.  (Zeplain Decl. ¶ 12.)  The parties' creation of a

24 continuing relationship that required that Treyled have ongoing obligations to the Trust and

25 continuing involvement with California is a factor that assists the Court in recommending that

26 Treyled purposefully availed itself of the privilege of doing business in California.

27  _____

28  [7] The Court reiterates that it makes no determination whether Treyled was properly licensed during the auction process for reasons previously explained.

1    In short, the Court is not persuaded that Treyled merely entered into a contract with a

2    California resident and did not otherwise purposefully avail itself of California.  In order to sell

3    the Policy and receive its fulfilment of the Agreement, Treyled agreed it would obtain and

4    maintain applicable California licenses. Treyled maintains it did maintain the appropriate

5    California licenses in conformance with California law.  Further, the Agreement's terms required

6    that for the one-year duration of the Agreement, Treyled would reach into California to

7    communicate offers to purchase the Policy to the Trust.  Indeed, Treyled offers evidence it did

8    reach into California to communicate at least one offer to the Trust, which led to further

9    negotiations with the Trust's representative. Additionally, the contemplated fulfillment of the

10   Agreement envisioned Treyled reaching into California with an offer to place the Policy.  The

11   acceptance of that offer would necessarily be dependent upon the result of activities in

12   California.  The Court therefore recommends finding there is enough purposeful availment by

13   Treyled to satisfy the finding of jurisdiction on the first prong.

14   **b.    Arising Out of Forum-Related Activities**

15   "The second prong of the specific jurisdiction test is met if 'but for' the contacts between

16   the defendant and the forum state, the cause of action would not have arisen." Terracom v. Valley

17   Nat. Bank, 49 F.3d 555, 561 (9th Cir. 1995) (quoting Shute, 897 F.2d at 385-86).  Generally, the

18   resolution of this prong relies heavily on the resolution of the purposeful availment prong.  At the

19   hearing, Treyled conceded that with the exception of Ms. Klosek's article and webinar, this prong

20   would be satisfied if the Court finds Treyled purposefully availed itself of California.

21   Petitioners contend that the parties' claims in the arbitration nor the claims in the petition

22   to vacate the arbitration award would have arisen but for Treyled's forum-related activities.

23   Petitioners aver that the claims in the underlying dispute arise out of the alleged breaches of the

24   Agreement and the fiduciary relationship that flowed from it.  (Opp'n 19.)  Petitioners argue that

25   the claims also directly implicate California law and Treyled's obligations thereunder.  Further,

26   Petitioners contend that their vacatur petition revolves around the same set of operative facts as

27   those arising from the arbitration and implicates questions of California public policy, including

28   whether enforcement of the Award would violate California policy.  (Opp'n 19-20.)

1   Even if the District Judge found Ms. Klosek's article and webinar could be imputed to
2  Treyled as advertising in California and thus a factor that may promote the transaction of business
3  in California by Treyled, Petitioners fail to show their claims arise out of either the article or
4  webinar presentation. The 2022 webinar and article occurred after the parties entered the
5  Agreement. While publication of the article and webinar occurred prior to the Trust's October
6  2022 sale of the Policy to Coventry, Petitioners fail to show that anyone from the Trust saw or
7  relied on the material, nevertheless that the underlying claim somehow arises out of the substance
8  of the webinar or article.  Petitioners therefore fail to meet their burden to show that but for Ms.
9  Klosek's article and webinar, the claims made by the parties in the Texas arbitration would not
10  have arisen.

11   The Court otherwise finds Petitioners have met their burden in satisfying the second prong.
12  But for the Agreement between the parties that contemplated future consequences in California
13  and created an ongoing relationship with continuing obligations, the dispute leading to the
14  arbitration—and ultimately the petition to vacate the arbitration award pending before the Court—
15  would not have arisen.  See Corp. Inv. Bus. Brokers v. Melcher, 824 F.2d 786, 789–90 (9th Cir.
16  1987) (finding that because the defendant's forum related activity is its relationship with the
17  plaintiff under the parties' contract and plaintiff's claims arise out of the contract, the arising out
18  of element is met); Graham-Bingham, 2012 WL 13020031, at *4 (finding the plaintiffs met the
19  arising out of element because the plaintiffs' claims would not have arisen but for the nonresident
20  defendant's efforts to create an ongoing relationship with the Washington forum).  Accordingly,
21  the Court finds the second prong of the specific jurisdiction test is satisfied.

22       **c.    Reasonableness**

23   The third prong, reasonableness, is presumed once the court finds the first and second
24  prongs.  Ballard v. Savage, 65 F.3d 1495, 1500 (9th Cir. 1995) ("[W]e presume that an otherwise
25  valid exercise of specific jurisdiction is reasonable.").  Respondent bears the burden of proving
26  unreasonableness.  See id.  To defeat personal jurisdiction, the respondent "must present a
27  compelling case that the presence of some other considerations would render jurisdiction
28  unreasonable." Burger King, 471 U.S. at 477.

1    The Ninth Circuit balances seven factors to determine whether the exercise of personal
2    jurisdiction is reasonable: (1) the extent of a defendant's purposeful interjection into the forum;
3    (2) the burden on the defendant of defending in the forum; (3) the extent of conflict with the
4    sovereignty of the defendant's state; (4) the forum state's interest in adjudicating the dispute; (5)
5    the most efficient judicial resolution of the controversy; (6) the importance of the forum to the
6    plaintiff's interest in convenient and effective relief; and (7) the existence of an alternative forum.
7    Harris Rutsky & Co. Ins. Svcs. Inc. v. Bell & Clements Ltd., 328 F.3d 1122, 1132 (9th Cir.
8    2003).  Jurisdiction is reasonable if "under the totality of the circumstances the defendant could
9    reasonably anticipate being called upon to present a defense in a distant forum."  Fed. Deposit
10   Ins. Corp. v. Brit.-Am. Ins. Co., 828 F.2d 1439, 1442 (9th Cir. 1987) (citations and quotations
11   omitted).

12   The Court finds that while the factors provide some force to having this matter
13   adjudicated in Texas where Treyled is at home and where the arbitration occurred, Treyled has
14   not presented a *compelling* case that it is unreasonable to subject it to personal jurisdiction in
15   California for Petitioners' petition to vacate the arbitration award.

16   First, the purposeful interjection analysis is analogous to the purposeful availment prong.
17   Sinatra v. Nat'l Enquirer, 854 F.2d 1191, 1199 (9th Cir. 1988).  The "smaller the element of
18   purposeful interjection, the less is jurisdiction to be anticipated and the less reasonable is its
19   exercise."  Ins. Co. of North America v. Marina Salina Cruz, 649 F.2d 1266, 1271 (9th Cir.
20   1981). Here, Treyled's interjection into California was purposeful and created continuing
21   obligations to the Trust.  However, the degree of Treyled's interjection was minimal.  See L.A.
22   Printex Indus., Inc. v. La Senza, Inc., No. CV 08-04791-RGK (JCx), 2008 WL 11340306, at *4
23   (C.D. Cal. Dec. 15, 2008) (finding this factor weighs in favor of neither party where the degree
24   of interjection was minimal).  The Court therefore finds this factor neutral.

25   Second, while Treyled asserts it would be burdened by defending the arbitration award in
26   California, it fails to make any showing of such burden.  "Unless such inconvenience is so great
27   as to constitute a deprivation of due process, it will not overcome clear justifications for the
28   exercise of jurisdiction."  Hirsch, 800 F.2d at 1481 (citing Burger King, 471 U.S. at 483-44).

1   Petitioners persuasively dispute whether any burden is imposed on Treyled given it has counsel

2   in this forum and their petition requires nothing more than submission of papers without the need

3   for any witnesses, discovery, or evidentiary hearings.  See Aero Air, 2007 WL 9809067 at *1

4   ("Whether to confirm or vacate the arbitration award will not require an evidentiary hearing with

5   witnesses. Because neither forum is any more convenient than the other, this factor is neutral").

6   Treyled confirms there is no evidence to gather or witness testimony to hear as the only issue in

7   the petition is a legal question.  (Mot. 15.)  The Court finds this factor is also neutral.

8        In support of the third and fourth factors, Treyled argues that courts in Texas have a

9   greater interest in whether to vacate or confirm an arbitration award that was entered following a

10  Texas arbitration that was presided over by a former Texas justice, involved Texas lawyers, and

11  applied Texas law.  (Mot. 13-14.)   Treyled otherwise makes no argument that determining a

12  petition to vacate an arbitration award would interfere with Texas sovereignty. The Court does

13  not independently find any interference with Texas sovereignty and thus finds the third factor

14  supports a finding of reasonableness.

15       The Court finds that the fourth factor, the forum state's interest in adjudicating the

16  dispute, is neutral.  Petitioners argue it is sitused in California and Treyled knew at all times that

17  the Trust's representatives were located in California. (Opp'n 21.)   Petitioners aver that

18  California has a strong interest in providing effective redress for its residents.  (Id.)  As Treyled

19  notes, however, a third party entity has agreed to fully indemnify Petitioners for all costs,

20  attorney's fees, and any judgment for which the California residents are liable in any dispute

21  with Treyled.  (Zeplain Decl. ¶ 14.)  Petitioners will therefore receive an effective means of

22  redress—full indemnification—in any forum.  Thus, the Court finds this factor is neutral.

23       Fifth, the efficient judicial resolution of the controversy factor focuses on where the

24  witnesses and evidence are likely to be located. As previously mentioned, the parties agree the

25  determination of whether to vacate the arbitration award will not require an evidentiary hearing,

26  discovery, or witnesses.  Accordingly, this factor is neutral.

27       The sixth factor is the importance of the forum to Petitioners' interest in convenient and

28  effective relief. "[I]n this circuit, the plaintiff's convenience is not of paramount importance."

1   Dole Food Co. v. Watts, 303 F.3d 1104, 1116 (9th Cir. 2002).  Petitioners, all of whom are

2   located in Fresno County, contend that there is no question that California is the most convenient

3   forum.   (Opp'n 22.)   Treyled, however, validly argues that ineffective relief or potential

4   inconvenience by the Trust to litigate in Texas—where the Trust has already litigated extensively

5   for nearly two years—would not be borne by the Trust because it is being fully indemnified and

6   represented by Coventry, an entity of unspecified domicile.  (Mot. 10.)  Thus, the Court finds

7   that Petitioners' choice of forum, already a factor not of heavy importance, is entitled to only

8   minimal deference under the circumstances of this case.

9       The seventh factor, unavailability of an alternative forum, "becomes an issue only when

10  the forum state is shown to be unreasonable."   Silk, 65 F.4th at 459 (quotations and citations

11  omitted).  Here, Treyled has not made that showing.

12      On balance, the Court finds Treyled has failed to meet its burden of presenting a

13  compelling case that exercise of specific jurisdiction over it is unreasonable.  Accordingly, the

14  Court finds the third prong of the specific jurisdiction test is satisfied.

15      For the foregoing reasons, the Court recommends denying Treyled's motion to dismiss

16  for lack of personal jurisdiction.

17      **B.   Improper Venue**

18      Treyled also moves to dismiss the Trust's petition to vacate the arbitration award because

19  venue in the Eastern District of California is improper.  A petition to vacate an arbitration award

20  may be brought in either the district where the award was issued or in any district deemed

21  appropriate under the general venue statute, 28 U.S.C. § 1391.   Day v. Orrick, Herrington &

22  Sutcliffe, LLP, 42 F.4th 1131, 1141 (9th Cir. 2022) (citing Cortez, 529 U.S. 193 (2000)).

23      As an initial matter, Treyled argues venue is improper in this district because the parties

24  agreed that the venue for any arbitration would be in Houston, Texas and the parties did in fact

25  arbitrate in Houston, Texas.  (Mot. 10; ECF No. 9-1 at 29.)  The Agreement, however, is silent as

26  to the forum to file for judicial review of any arbitration award.  As previously discussed, a

27  petition to vacate an arbitration award is a separate proceeding from the arbitration.  Cortez, 529

28  U.S. at 201 (explaining that flexibility to make practical choices could be hindered by a mandatory

1   venue rule because "[t]he parties may be willing to arbitrate in an inconvenient forum…but they

2   might well be less willing to pick such a location if any future court proceedings had to be held

3   there.")  Although the parties here could have specified in the Agreement that judicial proceedings

4   related to any review of the arbitration award would be heard by a court in the same district as the

5   arbitration, they did not do so.  Accordingly, the forum selection clause selecting Texas as the

6   venue for arbitration does not assist the Court in its determination of whether venue is proper in

7   this district to enter judgment in the separate petition to vacate the arbitration award.

8          Treyled's Rule 12(b)(3) motion turns on whether venue is proper under 28 U.S.C. §

9   1391(b)(2).  Petitioners allege that venue is proper in "a judicial district in which a substantial part

10  of the events or omissions giving rise to the claim occurred…." 28 U.S.C. § 1391(b)(2).

11  Specifically, the Trust alleges that the Settlors are located in this district and representatives of the

12  Trust negotiated the Agreement, carried out activities in connection with selling the Policy

13  pursuant to the Agreement, communicated with Treyled, and performed obligations under the

14  Agreement from this district.  (ECF No. 1 at ¶ 10; Opp'n 24.)[8]

15         Treyled argues that governing precedent dictates that the place of intended performance of

16  the contract is the relevant venue consideration.  (Mot. 10; Reply 8 (citing Decker Coal Co. v.

17  Commonwealth Edison Co., 805 F.2d 834 (9th Cir. 1986), superseded by statute 28 U.S.C. §

18  1391).)  Because the Agreement explicitly stated that it was "intended to be performed in the State

19  of Texas," Treyled avers venue in this district is improper.  However, the governing precedent

20  upon which Treyled cites, Decker Coal, relied upon an earlier version of 28 U.S.C. § 1391, which

21  required courts to identify the single district in which the claim arose.  See Richmond Techs., Inc.

22  v. Aumtech Bus. Sols., No. 11-CV-02460-LHK, 2011 WL 2607158, at *10 (N.D. Cal. July 1,

23  2011). Thus, when the Ninth Circuit in Decker Coal was grappling with selecting one option

24  between the place of intended performance of the contract or breach of the contract, it found that

25  basing propriety of venue on the place of intended performance better served the spirit of the

26

27  [8] Petitioners also argue the fact that Ms. Klosek wrote an article in a California law journal demonstrates a
    substantial part of the events or omissions giving rise to the claim occurred in this district.  (Opp'n 24.)  The Court is
28  unpersuaded.  First, the Trust in no way ties the article to this district.  Additionally, the Trust fails to show how the
    article is a "substantial part of the events or omissions giving rise to the claim…."  28 U.S.C. § 1391(b)(2).

1   former version of section 1391.  805 F.2d at 842.  The current version of section 1391 provides

2   that venue may be proper in multiple districts if "a substantial part of the events or omission

3   giving rise to the claim" took place in each district.  See 28 U.S.C. § 1391(b)(2)  Accordingly,

4   while Decker Coal supports the conclusion that venue is proper in the Southern District of Texas,

5   it does not support Treyled's argument that venue is improper in this district.

6         "Section 1391(b)(2) does not require that a majority of the events have occurred in the

7   district where suit is filed, nor does it require that the events in that district predominate." Vuori v.

8   Grasshopper Cap. LLC, No. 17-CV-06362-JCS, 2018 WL 1014633, at *18 (N.D. Cal. Feb. 22,

9   2018).  "Rather, for venue to be proper, significant events or omissions material to the plaintiff's

10  claim must have occurred in the district in question, even if other material events occurred

11  elsewhere." Richmond, 2011 WL 2607158, at *10 (quoting Gulf Ins. Co. v. Glasbrenner, 417

12  F.3d 353, 357 (2d Cir. 2005)).  "Where, as here, a case involves a contract dispute, courts have

13  'looked to such factors as where the contract was negotiated or executed, where it was to be

14  performed, and where the alleged breach occurred' to determine whether venue is proper."

15  Richmond, 2011 WL 2607158, at *10 (quoting Gulf Ins. Co., 417 F.3d at 357).

16        Here, negotiations regarding the Agreement were performed via telephone and email by

17  Treyled in Texas and Mr. Donovan in California.  (Zeplain Decl. ¶ 6; Opp'n 9, 24.)  Negotiations

18  included a proposal by Treyled to add a seller-friendly fee structure to its form Agreement.

19  (Opp'n 24-25.)  Petitioners allege that substantial events giving rise to the arbitration included the

20  Trust's representative's negotiations of the Agreement while present in the Eastern District of

21  California.  (ECF No. 1 at ¶ 10; Opp'n 24-25 (citing Bacchus Mgmt. Group, LLC v. Talisker

22  Canyons (WA DAKOTA), LLC, No. C 11-00987 JSW, 2011 WL 13243723, at *6 (N.D. Cal.

23  Aug. 2, 2011) (noting that "the fact that defendant was elsewhere during contract negotiation

24  conversations simply means that venue would also be proper in other locations, not that it is

25  improper in [California]." (quotations and citations omitted)).)  Throughout negotiations and at the

26  time the parties executed the Agreement, Treyled knew the Trust was sitused in California and that

27  Mr. Donovan, the only representative used by the Trust (Reply 7), was located in this district.

28  (Opp'n 19.)  The parties therefore reasonably anticipated that the Trust would perform its duties

1   and obligations in California.  Petitioners allege the Trust did perform its obligations under the

2   Agreement in this District.  (ECF No. 1 at ¶ 10.)

3       Further, the underlying claims giving rise to the arbitration include alleged breach of

4   contract by the Petitioners and counterclaims by Petitioners against Treyled for breach of fiduciary

5   duty and breach of contract. (ECF No. 1 at ¶ 12.) Petitioners contend that the issue in the

6   underlying arbitration was "whether an out-of-state broker, operating without proper California

7   licensure, harmed California-based Petitioners by breaching its fiduciary duty under the California

8   Life Settlement Act and under the Agreement." (Opp'n 29.) Petitioners allege the arbitration

9   award should be vacated in part due to the arbitrator's excusal of the Trust's affirmative and

10  defensive claims of breach of fiduciary duty, fraudulent inducement, and breach of contract claims

11  against Treyled.  (ECF No. 1 at ¶¶ 38-39.)  Accepting Petitioners' allegations as true, Treyled's

12  alleged breaches—substantial events or omissions giving rise to some of the claims—took place as

13  a result of Treyled's performance of the Agreement in Texas, but the effect was felt by the Trust in

14  this district.

15      The parties negotiated the Agreement from Texas and California.  Both parties raised

16  claims of breach of contract in the arbitration and the effect of each parties' alleged breach was

17  felt in both Texas and California.  The Trust's representative's communications with Treyled were

18  made from this district.  Treyled communicated with the Trust's representative in this district

19  regarding the Agreement, including the exclusivity provision and Treyled's commission.  The

20  parties performed their duties and responsibilities under the Agreement in their respective

21  domiciles in Texas and California.  The Court finds venue is proper in both the Southern District

22  of Texas and the Eastern District of California.  See Richmond Techs., 2011 WL 2607158, at *10

23  ("[Petitioner] need not show that the [Eastern] District of California has the most substantial

24  relationship to the dispute ... or that it is the 'best' venue.").  Accordingly, the Court recommends

25  that Respondent's motion to dismiss for improper venue pursuant to Rule 12(b)(3) be denied.

26      **C.**   **Transfer Venue**

27      Alternatively, Treyled argues the Trust's petition should be transferred to the Southern

28  District of Texas under 28 U.S.C. § 1404(a).  On this theory, the Court agrees.

Pursuant to 28 U.S.C. § 1404(a), "a district court may transfer any civil action to any other district or division where it might have been brought" for the convenience of parties and witnesses and in the interest of justice. "[T]he purpose of [§ 1404(a)] is to prevent the waste of time, energy and money and to protect litigants, witnesses and the public against unnecessary inconvenience and expense." Van Dusen v. Barrack, 376 U.S. 612, 616 (1964) (internal quotation marks and citation omitted). "Section 1404(a) is intended to place discretion in the district court to adjudicate motions for transfer according to an 'individualized, case-by-case consideration of convenience and fairness.'" Stewart Org., Inc. v. Ricoh Corp., 487 U.S. 22, 29 (1988) (quoting Van Dusen, 376 U.S. at 622).

District courts employ a two-step analysis when determining whether to transfer an action. "A court must first consider the threshold question of whether the case could have been brought in the forum to which the moving party seeks to transfer the case." Park v. Dole Fresh Vegetables, Inc., 964 F.Supp.2d 1088, 1093 (N.D. Cal. 2013) (citing Hoffman v. Blaski, 363 U.S. 335, 344 (1960)). If the party seeking transfer makes this showing, a district court has discretion to consider the motion to change venue based on an individualized, case-by-case consideration of convenience and fairness. See Jones v. GNC Franchising, Inc., 211 F.3d 495, 498-99 (9th Cir. 2000); see also Van Dusen, 376 U.S. at 622. District courts weigh private interest facts, public interest factors, see Atlantic Marine Const. Co. v. U.S. Dist. Court for the Western Dist. of Texas, 571 U.S. 49, 62 n.6 (2013), as well as a non-exhaustive list of at least ten factors the Ninth Circuit has identified district courts may consider, which includes:

> (1) the location where the relevant agreements were negotiated and executed, (2) the state that is most familiar with the governing law, (3) the plaintiff's choice of forum, (4) the respective parties' contacts with the forum, (5) the contacts relating to the plaintiff's cause of action in the chosen forum, (6) the differences in the costs of litigation in the two forums, (7) the availability of compulsory process to compel attendance of unwilling non-party witnesses, . . . (8) the ease of access to sources of proof[,] . . . [(9)] the presence of a forum selection clause, . . . [and (10)] the relevant public policy of the forum state.

Jones, 211 F.3d at 498-99.

In the ordinary case, a "district court . . . weigh[s] the relevant factors and decide[s]

1  whether, on balance, a transfer would serve 'the convenience of parties and witnesses' and

2  otherwise promote 'the interest of justice.'"   Atlantic Marine, 571 U.S. at 62-63 (quoting 28 U.S.

3  C. § 1404(a)).  "Weighing of the factors for and against transfer involves subtle considerations and

4  is best left to the discretion of the trial judge."   Commodity Futures Trading Commission v.

5  Savage, 611 F.2d 270, 279 (9th Cir. 1979) (citing Van Dusen, 376 U.S. at 622).

6        Preliminarily, the parties do not dispute that this action could have brought in the Southern

7  District of Texas.  (Mot. 15; Opp'n 26.)  Treyled's managing partners are residents of Houston,

8  Texas.  The FAA also provides for venue for a petition to vacate an arbitral award in the district

9  court where the arbitration took place, which is in Houston, Texas.  9 U.S.C. § 10.  Thus, the

10 Court finds venue would be proper in the Southern District of Texas, Houston Division.

11       In addition, the parties agree that the private interest factors, which concern issues that

12 occur before and during trial, are not relevant for a 1404(a) analysis here due to the summary

13 nature of this proceeding.  (Mot 11-12; Opp'n 26.)  There will be no trial or evidentiary hearing

14 and thus no evidence to gather or witness testimony.  Rather, the only issue is whether the petition

15 demonstrates that the arbitration award should be vacated on the grounds provided by 9 U.S.C. §

16 10.  (Mot. 11-12; Opp'n 26.)  The Court concurs with the parties that private interest factors are

17 not implicated in this 1404(a) analysis.

18       Turning to public interest factors, these include: (1) the administrative difficulties flowing

19 from court congestion; (2) the local interest in having localized controversies decided at home; and

20 (3) the interest in having the trial of a diversity case in a forum that is at home with the law.

21 Atlantic Marine, 571 U.S. at 62 n.6; see also Creative Tech., Ltd. v. Aztech Sys. Pte., Ltd., 61 F.3d

22 696, 703 (9th Cir. 1995) (discussing local interest as a public interest factor in a *forum non*

23 *conveniens* analysis).  While district courts at times use the phrase "local interest" when

24 conducting a § 1404(a) analysis, it has been in the context of the parties' contacts with the forum.

25 See e.g., Meza v. Procter & Gamble Co., No. EDCV 23-91 JGB (SHKx), 2023 WL 3267861, at

26 *6-*8 (C.D. Cal. Apr. 27, 2023).

27       Beginning with "the administrative difficulties flowing from court congestion," Treyled

28 raises the "longstanding judicial emergency" that this District is experiencing as a factor that

1  strongly favors transfer to the Southern District of Texas.[9]  While the statistics proffered by

2  Treyled reflect more court congestion occurs in this District, "*[o]n its own*,…the inundated state

3  of the Eastern District's case load is not adequate to warrant transfer." Hum. Res. Advantage,

4  2022 WL 1214899, at *9 (finding the court congestion factor weighed in favor of transfer).  That

5  said, given the FAA is meant to provide a mechanism for "efficient" "adjudication of a

6  confirmation application," the Court finds that Treyled's concern over an additional potential

7  delay in this District than compared to the Southern District of Texas is not without some merit.

8  (Mot. 16 (quoting Voltage Pictures, LLC v. Gussi, S.A. de C.V., 92 F.4th 815, 827 (9th Cir.

9  2024)).  That being said, if that were Treyled's primary concern, the Court would direct the parties

10  "to reconsider consent to conduct all further proceedings before a Magistrate Judge, whose

11  schedules are far more realistic and accommodating to parties." Rush Air, 2019 WL 4879211, at

12  *1; see also Hon. Kimberly J. Mueller, Magistrate Judge Consent in Civil Cases: Know Your

13  Rights! https://www.caed.uscourts.gov/caednew/assets/File/Consent%20Form%20Letter%20KJM

14  %2001042022.pdf ("As their professional biographies posted on our court's website show, our

15  Magistrate Judges are well-qualified to preside over the cases assigned them. They are

16  experienced, high-caliber judges with diverse experiences in civil and criminal litigation who have

17  been selected on the merits, taking into account their education, experience, knowledge of the

18  court system, personal attributes and other criteria. Our Magistrate Judges are well-qualified to

19  preside over the civil cases brought in our court.").  The Court gives some weight in favor of

20  transfer due to this District's heavier congestion, but that weight is small.

21

---

22  [9] Treyled points out that the Southern District of Texas has eighteen judgeships compared to this district's six
judgeships.  Treyled also directs the Court to recent data from U.S. District Courts—Combined Civil and Criminal

23  Federal Management Statistics, showing that as of March 31, 2024, the weighted filings per judgeship in the
Southern District in Texas is 561 compared to this district's 773.  (Mot. 16.)  Further, citing the March 31, 2024

24  Civil Statistical Tables for the Federal Judiciary, Treyled calculated this district takes approximately thirty percent
longer than the Southern District of Texas to resolve civil cases.  (Id.)  It thus appears that Treyled is suggesting the

25  Court consider something it is all too aware of, that "[j]udges in the Eastern District of California carry the heaviest
caseloads in the nation."  Rush Air Sports, LLC v. RDJ Grp. Holdings, LLC, No. 1:19-cv-00385-LJO-JLT, 2019

26  WL 4879211, at *1 (E.D. Cal. Oct. 3, 2019); Pizana v. SanMedica Int'l, LLC, No. 1:18-cv-00644-DAD-SKO, 2020
WL 469336, at *7 n.8 (E.D. Cal. Jan. 29, 2020); see also Hon. Lawrence J. O'Neill, et al., An Important Letter to

27  Congress from the Judges of the Eastern District of California Regarding Our Caseload Crisis, (June 19, 2018)
https://www.caed.uscourts.gov/ caednew/index.cfm/news-archive/important-letter-re-caseload-crisis/ (noting that in

28  2018, "[e]ach District Judge handles an average of approximately 900 cases at any given time, more than double the
nationwide average").

1    Next, Treyled argues that the second and third public interest factors also favor the

2  Southern District of Texas because the controversy concerns an arbitration award that was entered

3  in an arbitration that took place in Houston, Texas and applied Texas law.  Meanwhile, Petitioners

4  argue these factors actually favor this District's retention of the action because their vacatur

5  argument is grounded in fundamental California public policy questions.  The Court observes that

6  in the instant petition, Petitioners seeks vacatur because enforcement of the award "would violate

7  explicit, well-defined and dominant public policy in California pertaining to licensing

8  requirements and services contracts which require professionals to perform licensed conduct."

9  (ECF No. 1 ¶ 33.)  Yet, the petition continues, requesting vacatur of the award under two areas of

10  Texas law and public policy: "Enforcement of the Award would violate explicit, well defined and

11  dominant public policy in Texas, pertaining to unlicensed brokers performing licensed activity in

12  other states," (id. at   ¶ 34 (citing Tex. Ins. Code Sec. 101.001(d)), and "[e]nforcement of the

13  Award would violate explicit, well defined and dominant public policy in Texas, pertaining to

14  unlicensed brokers performing licensed activity in other states, under which the administrative

15  code has prohibited contracts used to effect life settlement which require any owner to condition a

16  life settlement contract on the exclusive dealing between the owner and the life settlement broker"

17  (Id. at ¶ 36.)  Given Treyled's sliver of contacts in this District, the fact that Texas law governs the

18  Agreement, that Petitioners request for vacatur of a Texas arbitration award pursuant to violation

19  of Texas law and Texas public policy, and the unique procedural posture of this case, the Court

20  finds the public interest factors weigh in favor of transfer to the Southern District of Texas.

21    The Court next addresses the relevant Jones factors.  Here, the parties have discussed (1)

22  the location of where the relevant agreements were negotiated and executed; (2) the respective

23  parties' contacts with the forum; (3) the contacts relating to the plaintiff's cause of action in the

24  chosen forum; and (4) the difference in the costs of litigation in the two forums.  The Court takes

25  each in turn.

26    The Agreement was negotiated through email and telephone with neither party stepping

27  into the other's state.  (Zeplain Decl. ¶ 6.)  It also appears that the parties executed the Agreement

28  over email.  (See id. at ¶ 6, 8, 9.)  Therefore, the factor of the location of where the relevant

agreements were negotiated and executed is neutral as to whether transfer is appropriate.

Next, as discussed above, the Court finds Treyled has minimal but jurisdictionally sufficient contacts in California which gave rise to the claims brought in the Houston, Texas arbitration, as well as the subsequent petition to vacate the arbitration award filed in this District. Thus, the Court disagrees with Petitioners' characterization of Treyled as "aggressively marketing" in California. And while Petitioners have a contact with this forum due to their physical location here, the Court is persuaded to not accord this great weight for two reasons. First, it is undisputed that in this case of minimal contacts, the Trust, through a third party, reached out to Treyled in Texas, which began this odyssey, notwithstanding the current procedural posture. (Zeplain Decl. ¶¶ 1, 4-5; ECF No. 19-1, 7-9.) Second, Petitioners state that they have "negotiated with Coventry a life settlement and an indemnification agreement protecting it from legal fees and potential losses in the Trust's unwanted arbitration with Treyled." (ECF No. 1 ¶ 17.) In other words, with Petitioners being indemnified,[10] it is unclear to the Court that Petitioners' chosen forum, under the circumstances of this case, ultimately carries more than minimal weight. That said, the Court finds that the parties' contacts with this forum and contacts relating to Petitioners' claims are both neutral.

As to the difference in costs of litigation, the Court finds teeth to Treyled's contention that it would be a significant cost for Treyled's counsel to travel to this district to litigate. (Mot. 10.) Counsel currently appearing on this Court's docket are similar to the attorneys appearing in the Texas arbitration. (See ECF No. 19-1 at 5.) Indeed, opening statements in the Texas arbitration were made by the same Illinois attorney that briefly argued in the October 9, 2024 hearing before this Court. The Court is therefore not persuaded by Petitioners' argument that it would be a significant cost for Petitioners' counsel to travel to Texas rather than California to litigate the petition to vacate the arbitration award rendered in Texas. The Court also acknowledges that the parties agree that "the only issue is a legal one" which requires no trial, evidentiary hearing, witnesses, or discovery. (Mot 11; Opp'n 30.) The Court cannot assume, however, that no

---

[10] For purposes of this motion, the Court has no basis to discern where Coventry is located.

1   argument regarding Petitioner's petition would be heard by a district judge.   Accordingly, the

2   Court finds this factor weighs slightly in favor of transfer.

3         Courts have also determined that transfer under section 1404(a) promotes judicial

4   efficiency by bypassing difficult questions of personal jurisdiction and venue, similar to those

5   present in the instant action.   Huynh v. Mercedes-Benz USA, LLC, No. CV 22-5045-MWF

6   (SKX), 2022 WL 18142559, at *4 (C.D. Cal. Nov. 8, 2022) (quoting Multistate Legal Studies, Inc.

7   v. Marino, CV 96-5118-ABC (RNBx), 1996 WL 786124, at *11 (C.D. Cal. Nov. 4, 1996) (noting

8   that "a change of venue from a forum where there is a difficult question of personal jurisdiction or

9   venue to a district where there are not such uncertainties serves the interest of justice.")   As

10  previously discussed at length, the Court finds the instant action to be a very close call regarding

11  whether personal jurisdiction exists over the Texas Respondent.   As to venue, *the parties agree*

12  that Petitioners' petition to vacate the Texas arbitration award could have been brought in the

13  Southern District of Texas, Houston Division. (Mot 15; Opp'n 26.)   While substantial questions

14  exist as to whether personal jurisdiction and venue are proper in the Eastern District of California,

15  it is indisputable that Respondent is subject to personal jurisdiction in Texas and that venue is

16  proper in the Southern District of Texas.   Accordingly, judicial efficiency weighs in favor of

17  transfer to the Southern District of Texas, Houston Division.

18        In light of the foregoing, the Court concludes that transfer is this case is appropriate in the

19  interest of justice.

20  **IV.**

21  **CONCLUSION AND RECOMMENDATION**

22        For the foregoing reasons, IT IS HEREBY RECOMMENDED that Respondent Treyled

23  Life Settlements LLC's motion to dismiss Petitioners Kenneth Newby, Steven Campos, Jeannine

24  Campos-Grech, and Joseph Campos' petition to vacate the arbitration award pursuant to Federal

25  Rule of Civil Procedure 12(b)(2) and 12(b)(3) be DENIED and its request to transfer venue to

26  the Southern District of Texas, Houston Division pursuant to 28 U.S.C. § 1404(a) (ECF No. 9)

27  be GRANTED.

28        These findings and recommendations are submitted to the District Judge assigned to this

action, pursuant to 28 U.S.C. § 636(b)(1)(B) and this Court's Local Rule 304.  Within **twenty-one (21) days** of service of these recommendations, the parties may file written objections to the findings and recommendations with the Court.   Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."   The District Judge will review the Magistrate Judge's findings and recommendations pursuant to 28 U.S.C. § 636(b)(1)(C).  The parties are advised that failure to file objections within the specified time may result in the waiver of rights on appeal.  Wilkerson v. Wheeler, 772 F.3d 834, 839 (9th Cir. 2014) (citing Baxter v. Sullivan, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated:   **December 20, 2024**

STANLEY A. BOONE
United States Magistrate Judge